USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 6/26/19

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

LAURA VENTOSO,

                          Plaintiff,

-v-

BILL SHIHARA, individually, BITTEX, LLC, a Nevada Corporation, and BITTEX, INC., a Delaware Corporation,

                          Defendants.

19 Civ. 3589 (PAE)

OPINION & ORDER

PAUL A. ENGELMAYER, District Judge:

Plaintiff Laura Ventoso brings claims against Bill Shihara; Bittrex, Inc., the Delaware corporation for which Shihara serves as founder and CEO; and Bittrex, LLC, the predecessor corporation to Bittrex, Inc.[1] The Complaint alleges common law fraud and violations of both New York's Deceptive and Unfair Trade and Practices Act, N.Y. Gen. Bus. L. § 349, and New York's Civil Theft Statute, N.Y. Penal L. § 155.05–155.40.

Defendants move to compel arbitration of Ventoso's claims. Defendants also move to dismiss Ventoso's claims pursuant to Federal Rule of Civil Procedure 12(b)(1) or, in the alternative, to transfer this case to the U.S. District Court for the Western District of Washington pursuant to the forum selection clause in Bittrex's Terms of Service. For the following reasons, the Court grants defendants' unopposed motion to compel arbitration and stays the case pending the completion of arbitration.

---

[1] For purposes of resolving this motion, the Court refers to the corporate defendants collectively as Bittrex.

## I.    Background[2]

### A.    The Parties

Ventoso is an individual investor who resides in New York. Compl. ¶ 31. Bittrex is an online platform through which general consumers "exchange, invest, and trade digital cryptocurrencies, Tokens and Fiat currency of different denomination." *Id.* ¶ 1. Bittrex, LLC, was incorporated in Nevada, and its successor, Bittrex, Inc., is incorporated in Delaware and has its principal place of business in Seattle, Washington. *Id.* ¶ 32. Shihara, a resident of Seattle, is the CEO and co-founder of Bittrex. *Id.* ¶ 31.

Some of the assets exchanged through Bittrex qualify as securities in the United States. *Id.* ¶ 41. Bittrex is registered with the Financial Crimes Enforcement Network as a Money Services Business. *Id.* ¶ 42. Such businesses must comply with certain obligations such as maintaining "certain financial records and allow[ing] free and unfettered access to consumer accounts." *Id.*

Bittrex solicits members of the public to create Bittrex accounts; deposit various currencies, including both fiat and cryptocurrencies; and trade those currencies with other users. *Id.* ¶ 43. When a user creates an account, Bittrex designates three separate Bittrex-wallets, each keyed to a particular kind of currency, and consumers subsequently deposit various currencies exchanged on the platform into the wallet corresponding to that currency. *Id.* ¶¶ 44–45.

---

[2] The Court draws these facts from the Complaint, Dkt. 1; the declarations of Moriah Kairouz Batza, Bittrex's Manager of Compliance Programs, Dkt. 11 ("Batza Decl."), and Kevin Woley, a Technical Product and Program Manager at Bittex, Dkt. 12 ("Woley Decl."); and the Terms of Service, Dkt. 12-2 ("Terms of Service"). "In the context of motions to compel arbitration brought under the Federal Arbitration Act ("FAA") . . . the court applies a standard similar to that applicable for a motion for summary judgment," *Bensadoun v. Jobe-Riat*, 316 F.3d 171, 175 (2d Cir. 2003), and courts therefore consider materials outside the Complaint, *see, e.g.*, *HBC Solutions, Inc. v. Harris Corp.*, No. 13 Civ. 6327 (JMF), 2014 WL 6982921, at *1 (S.D.N.Y. Dec. 10, 2014).

## B. The Terms of Service and the Arbitration Agreement

To buy and sell currency on Bittrex's exchange, a prospective user must first register by creating a Bittrex account. Woley Decl. ¶ 4. Prospective users do so by visiting Bittrex's website and clicking the "Sign Up" button. *Id.* ¶ 5. After entering a valid email address and creating a password, a prospective user has to check a box indicating agreement to Bittrex's Terms of Service and Privacy Policy. *Id.* A prospective user cannot complete the registration process without checking that box.

On April 11, 2018, Ventoso registered a Bittrex account. Batza Decl. ¶ 5. The operative Terms of Service at that time stated that "[b]y clicking on an 'I Agree' button or check box presented with these Terms or, if earlier, by accessing or using any Services, you agree to be bound by these Terms." Terms of Service at 1. The first page of the Terms of Service also states in all capital letters: "THE ARBITRATION CLAUSE IN SECTION 18 GOVERNS RESOLUTION OF CERTAIN DISPUTES AND WAIVES ANY RIGHT TO TRIAL BY JURY OR TO PARTICIPATE IN A CLASS ACTION." *Id.* Section 18 requires that, with one exception not applicable here, "all disputes, controversies or claims arising out of or relating to these Terms or the Services, will be resolved through confidential binding arbitration held in Seattle, Washington in accordance with the Streamlined Arbitration Rules and Procedures ("Rules") of the Judicial Arbitration and Mediation Services ("JAMS") . . . ." *Id.* at 15.

## C. Ventoso's Claims

Ventoso alleges that, on July 12, 2018, she deposited $120,000 with Bittrex. Compl. ¶ 50. In August 2018, she claims, Bittrex suspended her account and attempted to extort her by withholding the funds she had in her account unless she signed a contract relinquishing her right

3

to sue Bittrex. *Id.* ¶¶ 2, 15, 51–52. She alleges that Bittrex continued to deny her access to her account from early August through November 18, 2018. *Id.* ¶ 15.

Bittrex disputes these facts and argues that it blocked her access to the account because "she repeatedly failed to fill out a required form reflecting proof of the origin of the funds she deposited in her Bittrex account as required by New York's cybersecurity regulations and U.S. Anti-Money Laundering laws after repeated requests from Bittrex to do so." Dkt. 10 ("Def. Mem.") at 5; *see also* Batza Decl. ¶¶ 6–7 & Ex. B.2. Ventoso, however, claims that Bittrex restored her access to the account only after reporters from various publications, including Forbes Magazine and the New York Times, were informed of defendants' alleged practices. Compl. ¶ 19.

### D. Procedural History

On April 23, 2019, Ventoso filed her Complaint. Dkt. 1. On May 3, 2019, Judge Schofield, the judge originally assigned to this case, scheduled an initial pretrial conference. Dkt. 4. On May 14, 2019, the case was transferred to this Court.

On May 20, 2019, defendants filed a motion to compel arbitration or transfer the case to the U.S. District Court for the Western District of Washington, Dkt. 9, a supporting memorandum of law, Dkt. 10, and supporting declarations of Moriah Kairouz Batza, Dkt. 11, and Kevin Woley, Dkt. 12, with accompanying attachments. On the same day, defendants filed an affidavit of service stating that the motion and supporting documents had been sent to Ventoso via FedEx Overnight. Dkt. 13.

On May 21, 2019, the Court directed Ventoso to file any opposition by Monday, June 10, 2019. To this date, Ventoso has not opposed defendants' motion.

4

## II. Applicable Legal Standards Under the Federal Arbitration Act

The Federal Arbitration Act ("FAA") provides that an arbitration agreement "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The FAA "'creates a body of federal substantive law establishing and regulating the duty to honor an agreement to arbitrate disputes.'" *Mitsubishi Motor Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 625 (1985) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 25 n.32 (1983)). Congress enacted the FAA to reverse "centuries of judicial hostility to arbitration agreements" and "to place arbitration agreements upon the same footing as other contracts." *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 511 (1974) (internal quotation marks and citation omitted).

In resolving a motion to compel arbitration, a court must determine: (1) whether the parties entered into an agreement to arbitrate; (2) if so, the scope of that agreement; (3) if federal statutory claims are asserted, whether Congress intended those claims to be nonarbitrable; and (4) if some, but not all, claims are subject to arbitration, whether to stay the balance of the proceedings pending arbitration. *See Guyden v. Aetna, Inc.*, 544 F.3d 376, 382 (2d Cir. 2008).

On a motion to compel arbitration under the FAA, "the court applies a standard similar to that applicable for a motion for summary judgment." *Bensadoun*, 316 F.3d at 175. "[W]here the undisputed facts in the record require the matter of arbitrability to be decided against one side or the other as a matter of law, we may rule on the basis of that legal issue and avoid the need for further court proceedings." *Wachovia Bank, Nat'l Ass'n v. VCG Special Opportunities Master Fund, Ltd.*, 661 F.3d 164, 172 (2d Cir. 2011) (internal quotation marks omitted).

The party moving to compel arbitration "must make a prima facie initial showing that an agreement to arbitrate existed before the burden shifts to the party opposing arbitration to put the

5

making of that agreement 'in issue.'" *Hines v. Overstock.com, Inc.*, 380 F. App'x 22, 24 (2d Cir. 2010) (summary order). The moving party need not "show initially that the agreement would be *enforceable*, merely that one existed." *Id.* (emphasis in original). Thereafter, the party "seeking to avoid arbitration generally bears the burden of showing the agreement to be inapplicable or invalid." *Harrington v. Atl. Sounding Co., Inc.*, 602 F.3d 113, 124 (2d Cir. 2010) (citing *Green Tree Fin. Corp.–Alabama v. Randolph*, 531 U.S. 79, 91–92 (2000)).

### III. Discussion

#### A. Motion to Compel Arbitration

Defendants argue that, because the then-operative Terms of Service required Ventoso to arbitrate her claims, the Court should either issue an order compelling arbitration or stay the case pending resolution of the class arbitration. Ventoso has not opposed defendants' motion.

In deciding whether the parties' dispute is arbitrable, the Court must answer two questions: "(1) whether the parties agreed to arbitrate, and if so, (2) whether the scope of that agreement encompasses the claims at issue." *Holick v. Cellular Sales of New York, LLC*, 802 F.3d 391, 394 (2d Cir. 2015) (internal quotation marks and citation omitted). Both requirements are clearly met here. Accordingly, the Court grants defendants' unopposed motion to compel arbitration.

First, defendants submit sufficient documentary evidence of a valid arbitration agreement between the parties. This consists of the Terms of Service operative when Ventoso registered her Bittrex Account. *See* Dkt. 12-2. Section 18 of the Terms of Service clearly put Ventoso on notice that by registering her account, she agreed to resolve all claims not related to the validity of Bittrex's intellectual property rights through "confidential binding arbitration held in Seattle, Washington." *Id.* at 15. Importantly, when Ventoso originally signed up for her user account,

she checked a box to indicate that she accepted the Terms of Service, including the mandatory arbitration clause. The Second Circuit has made clear that such "clickwrap" agreements can serve as valid consent to arbitrate because in checking a box the user must affirmatively assent to the terms of the agreement. *See Meyer v. Uber Technologies*, 868 F.3d 66, 75 (2d Cir. 2017).

Second, the question of whether the Terms of Service cover the claims raised in Ventoso's underlying Complaint is a question for the arbitrator. As the Supreme Court has explained, "parties can agree to arbitrate gateway questions of arbitrability, such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy." *Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 68–69 (2010) (internal quotation marks and citation omitted). Here, the Terms of Service explicitly provide, subject to exceptions not relevant here, that "*all* disputes, controversies or claims arising out of or relating to these Terms or the Services" be resolved through arbitration. Terms of Service at 15 (emphasis added). "When the parties' contract delegates the arbitrability question to an arbitrator . . . a court possesses no power to decide the arbitrability issue." *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 529 (2019).

**B.     Motion to Transfer**

Defendants also request that the Court transfer this case to the U.S. District Court for the Western District of Washington. The Court reserves decision on that motion.

The Second Circuit has held that that "the text, structure, and underlying policy of the FAA mandate a stay of proceedings when all of the claims in an action have been referred to arbitration and a stay requested." *Katz v. Cellco P'ship*, 794 F.3d 341, 347 (2d Cir. 2015). Although not requested here, such a stay is appropriate because it will expedite this case by enabling prompt arbitral resolution of Ventoso's claims and deferring any appellate review until

after the arbitration has concluded. Accordingly, the Court stays this case and holds in abeyance the motion to transfer pending arbitration.

## CONCLUSION

For the foregoing reasons, the Court grants the motion to compel arbitration and stays the action pending the outcome of arbitration.

The parties are directed to submit a joint status letter to the Court every 90 days, measured from the date of this decision, advising the Court as to the status of arbitration proceedings.

SO ORDERED.

*Paul A. Engelmayer*
Paul A. Engelmayer
United States District Judge

Dated: June 26, 2019
New York, New York